May it please the Court, Kelly Flanagan for appellants. This is a unique case involving a fairly limited issue, whether the county must be forced to convert its library meeting room into a church. The Faith Center here admittedly seeks to conduct religious worship services at the library, and no court before the court below has ever held that a meeting room such as the library's library be forced to be open for religious services. Well, that Fifth Circuit case by Judge Jolly comes pretty close, doesn't it? Is that the – if you're referring to the Concerned Women of America case? Yes. Well, that's not a church seeking to hold religious services. It's a group of women seeking to discuss certain issues, and perhaps may include prayer about those issues, but that would be different than a church having a religious service. Well, that kind of gets sort of to the heart of it, doesn't it? It does. How do we define religious service without looking at the content of what they're doing and having the librarian monitoring what's being said during the use of that facility to determine whether they're worshiping or not? Well, I don't know that it's as broad as determining whether they're worshiping or not. The issue really is because all we exclude is a religious service, and if they're conducting a religious service, certainly the religious group knows what a religious service is. It's like pornography. We know it when we see it. I was going to say, what is religious service? What is a religious service? It's an organized worship service that religious sects ordinarily hold in a sanctuary of some sort, is at least one definition. And I suppose for different religions, a service has different components. I mean, does a service always have prayer? I don't know. I don't know every religious service that could happen on the face of the earth probably. I mean, that's certainly a component of most religious services. Where do I look in the policy that the Contra Costa County Library System has promulgated, if I'm the librarian of the Antioch Library, to help me determine what a prohibited religious service is under the policy? Well, I don't know that you have to do that if you're the librarian because our policy says no religious services. We rely on everyone coming to use the meeting room to accurately tell us. The librarian refused to allow the pastor's group to use the meeting room because the librarian determined that they were engaged in religious services in violation of the policy, correct? Well, that was the initial rejection or the initial telling them that they couldn't come back. So how does the public official make that decision? The group here themselves admit they want to have a religious service and on their flyer describe it as a separate entity. And like we rely on all groups wanting to use the meeting room, we have an application. They're supposed to describe what they're doing. Well, they had two events. Correct. The morning event was schedule of word shop and how to learn how to pray. Right. And apparently, as I understand the state of the argument today, you're not concerned about that issue, that part of the... Correct. I think that would have to be allowed in. And why is that? Explain that to me. Well, because teaching someone how to pray is like teaching someone how to do any number of other secular activities. There's certainly secular equivalence of instructional workshops. There aren't secular equivalence of religious worship services. It's a separate category. Okay. So in the afternoon session, they define as or describe as praise and worship is how it's written here. Special speaker, Dr. Hattie Hopkins, sermon, positioning yourselves for victory. Right. And it's been undisputed through the course of this case that what they intended to do that afternoon was have a religious worship service. But your definition, your policy says religious services. Correct. So does it make a difference that they characterize it as praise and worship? Well, what they call it on their flyer, the exact words they use, I don't know that they'd have to use the words religious services. I mean, they've conceded here that that's what that is. And when they apply to use the library meeting room, presumably they'd know what the library policy is. And when asked what they're doing, if that includes a religious service, they should know that they're not supposed to be doing that in the library meeting room. But you still haven't really answered me. Why is it a religious service? Or you haven't answered Judge Tallman's question. Well, they've conceded that here, that it's a religious service. What is it about it that makes it a religious service? Is it they begin the day, they begin the session and somebody offers a word of prayer? Does that automatically make it a religious service? Followed by a sermon, followed by testimonials, followed by a closing prayer. Does that make it all a religious service? If that's the nature of religious services and the religion that's conducting those services, yes, that's what would make it a religious service. Okay. Now, how about the fact that the sermon, you know, any member of the public might sort of enjoy the sermon, just kind of, you know, good moral, ethical values of some sort, helping the poor. Well, the fact that members of the public might enjoy it doesn't change the character of the activity as a religious service. And that's a different category of activity than the discussion of otherwise permissible subjects from a religious perspective. Let me ask you a question. How does this case differ from the Second Circuit's decision in Bronx Household? Well, in Bronx Household, the group that wanted to use the school facility, that wanted to rent the school facility while the school was empty, did not characterize themselves a segregable portion of what they were doing as a worship service. And the court there declined to separate out the various activities. There's Ninth Circuit decisions, Hills, Lassonde, and others, where appropriate religious speech, so to speak, is parsed from that which is inappropriate. In Hills, there were some summer camp brochures, and the school was forced to distribute those summer camp brochures even though it was a Bible camp. But the school was told that to avoid an establishment clause problem, it had to parse out proselytizing language from those brochures. So the Second Circuit declined to engage in that sort of parsing, but it's been done in this circuit previously, and particularly given that the group itself separated its activities in this case. I guess the problem I have with your argument is that on the record before us, it's not a self-executing policy. A government official, the librarian at Antioch, had to look at the policy, look at what the group was doing in the public meeting room, and conclude that what they were doing was engaging in religious services based upon the content of what they were doing. And I don't understand how that's different from the situation that confronted the Fifth Circuit in the Concerned Women of America case where the librarian said, you can't use the auditorium because you're praying in our room. And the problem that the Fifth Circuit had, which is the same one I'm having under the Supreme Court authority, is that is viewpoint-based discrimination. The only way to make that determination is to look at the content of what is occurring in the room and then tell the group you are not permitted to engage in that kind of behavior in using a meeting room that we've opened to the public for purposes of all sorts of cultural activities. But that is the, I mean, praying on a subject, whatever it might be, that's permissible in the forum, is different than conducting a religious service. How does the librarian know that? There's nothing in the policy that tells the government official how to define a religious service. You would agree, would you not, that worship includes prayer? Correct. So if the group goes in and spends an hour praying, are they conducting a religious service or are they engaged in a word shop? Well, if the word shop is truly an instructional workshop of some sort, presumably the entire time they wouldn't just be praying. But in this case, certainly prospectively, if religious services are precluded, we've got to rely on the people using the rooms to tell us what they're doing. People using the room told the county what they wanted to do in the room, and the county initially issued a permit authorizing them to do it, and then presumably they were given a copy of the county policy at some point, and it wasn't until the county official said you can't use the room for that purpose that the policy was invoked. It wasn't because the group said, oh, we see here that the policy prohibits religious services, therefore we're engaged in an improper use, we'll cease and desist our activities. They want to use the room. Well, but to some degree the group has to be responsible for telling the library what it's going to do. I mean, the library doesn't generally engage in, when someone says I want to use the room for a homeowners association meeting, they don't go check out what the group's actually doing. Here the group told the librarian what they wanted to do, and the librarian said based upon what you're going to do in there, I'm deciding that you're engaged in prohibited religious services and I'm revoking your permit. Now, why doesn't that constitute government entanglement in religion? A public official is deciding based upon the content of the speech that the public forum cannot be used for that purpose because it's impermissible. Well, but that's the government can do that. We can make a content-based distinction on what speech is allowable in a forum like this, and that's what we're doing here. But doesn't the Supreme Court authority say that it has to be done using the narrowest possible limitations and leave no discretion to the official that you can impose reasonable time, place and manner restrictions, all that? No, I think it says it has to be done in a viewpoint-neutral way, which is the way we're doing it here. We're not excluding any particular viewpoint. All religious services are excluded. But the problem that I'm struggling with is I don't know what religious services are under this policy. I see two words. That's all I see. And your answer to how I determine it's religious services is, well, Your Honor, you'll know it when you see it. Well, there's not a lot of authority in that regard, but there is a case, Trinity United Methodist Parish from the Southern District of New York, which we cited, that says the terms, quote, and religious instruction, end quote, have a common meaning so that people of ordinary intelligence can determine what they mean. And that's what the standard is, is whether a person of ordinary intelligence could determine what it means. I'd also point out that the Federal Government, for example, in charitable choice provisions and other things that we've cited, uses the terms sectarian worship, instruction, or proselytization without definition that we've been able to find in order to determine whether or not funds can appropriately be expended. There's an executive order also about charitable choice type provisions that uses religious activities such as worship, religious instruction, and proselytizing without definition that we can find. So the Federal Government apparently believes that similar terms have sufficient clarity to be used in statutes and regulations that pertain to the allowing of religious groups to provide social services, but not to provide social services at the same time or in the same place as those other activities. Does it make a difference that these activities are being conducted during normal business hours for the library as opposed to after hours like the school cases? I think it does. I mean, the courts in all of the cases that involve schools make note and reference to the fact that it's being done after hours when the school is effectively empty, except for the people who are going there. Schools are a little bit different, right? Schools are a little bit different, especially here in California. We have an education code that allows empty school buildings to be used for religious services if the space is paid for. But the cases all make reference to the fact that the activities in question are being held after hours. So I would presume the courts make note of that for a reason. But isn't the reason because we don't want to compel, in the case of schools, school children to be exposed to activities that their parents may not want them to be exposed to by virtue of the fact that their attendance at school is compelled? Well, no, because I don't think it's any different. I mean, someone could have an activity at a school where there were children present in a classroom or an auditorium or something that was something that children at our library would be exposed. And yet the courts have still chosen to comment on the fact that it's significant that the events are happening after hours. Okay. But you're not alleging, as I understand it, either disruption to the normal, quiet operations of the reading room of the library? And I guess your answer also is that it can be conducted behind closed doors so that patrons of the public part of the library who do not wish to expose themselves to what's going on in the meeting room don't have to know about it. Well, not that they necessarily don't have to know about it. Certainly whatever is going on in the meeting room, whether it be a religious service or a meeting of a homeowners association, is going to be done behind closed doors because a library is a quiet place and any sort of meeting might disrupt that. But the fact is people in the library may well know what's going on. There's, you know, there's flyers in this case that were distributed. Certainly people in the community would know what's going on. We're a group to publicize this. But they would know that in those after-hours school cases, too, wouldn't they? I'm trying to understand the constitutional significance of that differentiation. They might know it's going on. But again, in the after-hours case, in the after-hours case, the religious activities, whatever they may be, are going on when no one else is present. And presumably people know that, too. Here you're converting a portion of a library into a church when other people are there, when children are there. But a portion of a school is being, for the same reason, is being converted to a church on Sunday morning, is it not, if the school auditorium is being used? If it's being, if an empty school is being rented for that purpose, perhaps, yes. But this is a free meeting room while the library is open. But as I understand the policy, this is not a group that you would normally charge for the use because they're not involved in a for-profit activity, right? Well, that's correct. And they're certainly free to use the meeting room for whatever purpose they choose that falls within the policy. Let me take you to the policy for just a moment. The policy was educational, cultural, and community interest. Right. So what you're saying is that a religious service, or as they've defined it, religious worship, does not constitute educational, cultural, or community interest? No. The religious service is excluded apart from that. It's a different part of the policy. Okay. Let me take you, one of the groups that has used the meeting room in the past has been Alcoholics Anonymous. Narcotics Anonymous. Narcotics Anonymous, okay. So what if Faith Center said, we have the answer to your narcotic addiction. We've got it. Come to our presentation on Saturday afternoon at 3 o'clock and listen, partake. And lo and behold, what they have to offer is prayer, a sermon, and more prayer. Testimonials. If that's their regular... Accepting Christ will help me control my addiction. Why is that educational and not religious service? Because I gather you would tell me that that would be permitted. If what they're doing is inviting narcotics addicts to come to their regular religious services, then it would be prohibited. If instead they want to have a presentation to narcotics addicts saying, accept Jesus Christ and you'll be free of your addiction, I suppose maybe that's... You know, it looks just like this. Just as they say, a prayer, a sermon about the evils of addiction, of narcotic addiction, followed by, you know, you're familiar with, I don't know if you are, but you may have seen Alcoholics Anonymous, you know, it's very similar. Right. So if that were what the Faith Center wanted to do, would that be prohibited? Well, if it's... There's a difference, we believe, between a regular religious service, ordinarily held in a sanctuary of some sort, and a religious discussion about some other topic. And there are references at least in the cases to, for example, the DeBoer case, which is a Seventh Circuit case about a national day of prayer service versus a group's regular religious services. And they said you have to let the national prayer service in, but the village would not be engaging in viewpoint discrimination to keep the regular religious services out. They don't say what that means. Presumably the church knows what their regular religious services are, and the church here wants to use an alternate building to spread the gospel of Jesus Christ, because some people won't come into a church. And the library meeting room being used as an alternative to a church sanctuary on a Saturday afternoon or Sunday morning, or whenever it is that the group holds their services, is a distinct category of activity. It's a different category, and the exclusion is based on the type of activity, just like we allow the Democratic Club in to discuss issues, but we preclude by statute campaign activity. It's a similar activity, but it's a different activity. Let's say the Democratic Party comes in and has a big political rally or whatever. No, that's campaigning. Can they come in and discuss political issues? Can they come in and discuss and say the Democrat position? What if they had a meeting that said where the focus was we need more social programs? That's not the campaigning activity is activity designed to support or oppose a particular candidate, not discussing what the Democratic viewpoint is on certain social issues or political issues. So if they have a meeting at which the Democratic Party decides on their platform issues and what candidates they're going to advance in the county elections. I think that would be precluded from the library meeting room. I mean, they can discuss the issues. They can discuss the issues from their political viewpoint, but they can't campaign, just like the religious groups can discuss issues. They can discuss their religion. This is the librarians going to be quite busy. Well, again, if someone comes and says we want to use this for a homeowners association meeting, we don't go in the meeting room and make sure that's what they're doing. We rely on them to accurately fill out the application form. We rely on them to know what the policy is, just like everybody's got to know what various rules and regulations are. Let me ask you. What is the reason given for not allowing this particular afternoon event? Why religious services? Because the Establishment Clause presumably still has some viability, and the government, the character of a religious service is such that to have a religious worship service in a public building while it's open. Let me ask you. Does that rise to a compelling reason? It might, although because we believe this is content-based discrimination or content-based distinction, it need only be reasonable. Well, how do you distinguish WIDMAR? WIDMAR involved, did it not, the use of university property to conduct religious services? Yes, it was a different forum than the library. It was a wide-open forum for the student speech, at least. And WIDMAR's discussion of religious worship versus other religious speech is in the context, in a footnote, of responding to the dissent suggestion that religious worship isn't protected by the First Amendment. And in saying that religious worship is protected by the First Amendment, the Court talks about, you know, potentially difficulties in distinguishing. But it's in the context of deciding whether it has First Amendment protection. And just because it has First Amendment protection, which we fully acknowledge, doesn't mean that it has free reign in every potential government forum. But you invoke the Establishment Clause, and WIDMAR specifically rejected the university's invocation of an Establishment Clause violation. But that was in a wide-open forum with all kinds of student groups and, again, a student club wanting to conduct various activities, not a church wanting to have its regular worship services. So that's what the problem is here? Yes. Let me ask you again, though. I just want to make sure I understand your position. And that is getting back to my narcotics, anonymous example. So let's just say that they advertise, you know, Faith Center Church as an answer to narcotic addiction. You guys let the library say, oh, great, you're in. Turns out, when the library watched it, lo and behold, it's a service. Well, we can't make people be honest with us. Prayer, it's here's how we control addiction, accept Christ. Someone, if they want to do that. More prayer, more testimonials. And the librarian says, aha, what you did here was conduct a religious service. You're out of here. Can they do that? If if, in fact, it is a religious service. I mean, we we we can't force people to be honest in their applications. If someone says I want to have a homeowners meeting and then they have a religious service, they've, you know, lied to us. But but we can't base our policy on the fact that people might be dishonest. And I think it's disingenuous for a religious group to suggest they don't know what a religious services. OK, we better we better. Thank you. Thank you. May it please the court. I'm Benjamin Bull and I represent Faith Center and Patty Hopkins. I would like to leave about six minutes or so for the United States Department of Justice to participate in our argument. In all candor, we found the policy somewhat incoherent. Addressing counsel's first point about concern about turning the this meeting room, this community room into some sort of church. I think it's important to remember that that faith centers only requested to use the facility for one Saturday for four hours every other month. So as a matter of fact, we're talking about a total of six times a year. And to be perfectly candid in responding to that, this would no more turn this meeting room into a church than allowing Narcotics Anonymous to use it into the Betty Ford Clinic. And if there ever, as a matter of fact, it's based upon empirical fact, is a situation in which a church or religious institution dominates this forum, as the court in Widmar mentioned near the end of the case, then we would this court or another court would take up those facts, you know, as a unique set of circumstances to weigh that to see if this changes anything. But that gets into the county can impose reasonable restrictions as to time, place, and so on, correct? Yes, sir. And you can see it under Widmar that if the church said we want to use it every Saturday between 10 and 2 p.m., that the county could say, look, our intent is to open this facility to a number of groups, and it's going to be done on a first-come, first-served basis, and you're just going to have to take your chances as to whether it's available that day or not. I do. That would be okay. Yeah, I do. I agree, and I think that's a very important point. Content-neutral time, place, or manner restrictions can be imposed against Faith Center as it can against any other church. This particular meeting room, if you go in, there's a sign that says maximum capacity, 110 persons. It's used regularly throughout the week. And so those neutral, content-neutral time, place, and manner restrictions could be imposed against any group. Faith Center is just one of multiple groups, including the Boy Scouts and the Girl Scouts, that use similar facilities inside the county. I don't know where to begin, except, as I say, we simply do not believe that the council's argument holds much water. The case is controlled in our judgment by Widmar. It's on all fours. More recently, we believe the second Brock's Household of Faith case is virtually dead on here. The St. Tammany Parish case, which was another post-Good News Club case, we believe is on all fours. And we believe that the Good News Club case disposes of this particular case as well, or decides this case. If you look at essentially what we have here is the county resurrecting or trying to resurrect Justice Souter's argument in the Good News Club case, where he said that this kind of activity is a separate category and could be treated as such. And the majority just didn't buy it. In fact, reduced to its essence here, we see that religion as a topic or subject matter is permitted within the forum. We know that. We even know that religious activities are permitted within the forum. And we know that teaching prayer and prayer is permitted within the forum. And we also know that denigrating or criticizing a deity is a permitted expression in the forum. And we also know that worshiping or praising a deity, taking them at their word, would be prohibited. Now, as we have listened to them, read their papers, and gone through their arguments and participated in arguments in lower court, and even today, we can't tell you when singing Christian songs or reading scripture or teaching moral behavior and good conduct from a religious perspective stops being reading, singing, and teaching and becomes religious worship or religious service. Well, if you go to some religious services, you have an idea of what to expect, of what the service is going to encompass. Yes, indeed. And it is a religious service that promotes the particular religion, that fulfills the goals and the purposes and the beliefs of that particular religion. And you know that. When you go there, this is what you're going to get. I agree. I think, and Justice Thomas addressed that, but he warned not to look at the label attached, religious worship. You have to look at the substance or the content of the expression at issue. But the county says they just looked at what the way in which it was described. It says here, praise and worship. Yes. Why can't they accept that that faith center is going to conduct one of its own religious services of praise and worship? Again, you have to look at what does that mean. That's a conclusion. What's going to take place? That's the way they described it. That was the idiosyncratic description used by Hattie Hopkins. What is religious worship? Religious worship amounts to teaching moral behavior and good conduct from a religious perspective, singing Christian songs and reading scripture. I mean, I think we can all agree to that. Where we don't know and what the county can't tell us is where that stops being singing songs, reading scripture and teaching moral behavior from a religious perspective and suddenly jumps into this magic category. Aha, you're now a religious service. And that creates an inherent vagueness issue and also a prior restraint issue. Because Ms. Hopkins and others, your example involving the drug addicts anonymous or alcoholics anonymous, at what point does that become too religious? And how is a librarian supposed to know that? It clearly leads into an excessive kind of entanglement that the Supreme Court warned about in Widmar. There's simply no way of getting around that, we submit. And I don't think in their papers and what they've argued today, the county's gotten around that, nor can they. Let me give a little different example. Suppose for some reason or other, you know, take any reason that local, maybe let's just pick a religion, a local Lutheran church, for example, that for some reason or other, they needed to conduct their specific service on Saturday afternoon at 3 o'clock in the public library. And everybody knows if you go to a Lutheran service, what to expect. They go and they go to the library and they say, this is what we're going to do. Library says, no, it's a religious service. Can they do that? I think not. Not if they open it. This forum is open to any public expression that's related to community, culture, or educational issues. And they've not disputed that what Ms. Hopkins and Faith Center did falls within that, you know, those broad topics. In fact, it's difficult to imagine a broader array of expression that's permitted there. The first question is, is what the Methodist Church doing, Does it fall within those three broad topics? Is it educational? Certainly, I think so. It's open to the public as well. Does it relate to the culture? Yes, I think so. Does it relate to the community? Yes, indeed. Does it involve praise of a deity? Yes. On the other hand, can other groups go in and denigrate or criticize or discuss the deity? Yes, they can. Therefore, to ban them is clearly viewpoint-based discrimination and under any kind of forum. We would say from the county's perspective, the way in which they defined or the regulation that they have adopted, having adopted that particular regulation, they have to live with it. Yes. Now, suppose they had said, we're only going to allow these community rooms to be used for promotion of literary endeavors. Literacy, let's say, teaching literacy. And then, you know, it's educational. And then, you know, they just stuck to that. Could they do that and do that? And then when Faith Center comes along and says, nope, you're not teaching literacy, this is not teaching literacy, this is promoting religious service, furthering a religious service. Could they do that? That's a good question. I don't think we have to deal with that here, but I'll do my best. Well, I'm curious because I'm kind of curious, you know, I'm sure the library is kind of curious about this. I'll do my best to answer that question. If that's the only permitted use, literary discussion, then clearly they could not ban a speaker that came in and discussed that topic from a religious viewpoint. You know, for instance, banning the Bible. We want to study the Bible as literature. And a teacher came in and said, you know, not only is the Bible literature, it's the inspired word of God. A librarian couldn't run in and put a muzzle over the speaker's mouth. Okay. That's a little bit different, though. But suppose the Faith Center Church came in and said, here's what we want to do. And we can have a sermon here about the need for learning how to read. Could they? Under the present topic? No, I'm talking, I'm just curious about where this all goes. There are some, certainly there are some restrictions. A good example, if I could answer it this way, would be the Doloreto case. Or even the Children of the Rosary case, where you had a commercial forum, a commercial activity, or a forum created only for commercial activities. And somebody said, came in and said, you know, well, our speech is not commercial, but it's religious, and you can't keep ours out. And they said, no, this is only for commercial speech. I think under Doloreto in the Ninth Circuit, you have to keep them out. The same thing in the Children of the Rosary case as well. If you have, if a faith center wants to come in and have a literature class, though, and study the inspired books of the Bible, I don't think under the policy, the hypothetical policy the court asked about, it could be kept out. Okay. But that's not the, I understand, that's not the policy we're dealing with. We're dealing with one that was broadly defined as cultural, educational, and community. I think I know your answer to this, but I probably should have asked Ms. Flanagan. Your position, I think, is that by virtue of the way the county has drafted the policy, this is an open public forum. We would say it's a designated forum, a designated public forum, because it's open to all or part of the public for a broad array of expression. As a practical matter, we can't imagine, we don't see any limitations here. Let me take this to the extreme example, and I don't know if it's extreme or not, but suppose the Ku Klux Klan came and said, knocked on their door and said, we want to have a meeting here and we're going to talk about the evils of, you know, rights and whatnot. Do they have to let them in? Yeah. I think the answer was answered, yes, I think the answer was answered, the question was answered in Panett versus Capitol Square where Justice Scalia and then the majority said, you know, putting a cross up in the name of the Ku Klux Klan, if you've allowed other community groups on the premises, they cannot be excluded. Now, the county doesn't have to open up these community groups. Right. We accept that. That's doctrine. But once they do that and they allow the Boy Scouts, they allow Alcoholics Anonymous and they allow these other groups, they have to allow the church group in, and they cannot discriminate against their speech on the basis of viewpoint. Well, go ahead. I assume that's why Judge White refused the county's request for an injunction to prevent them from closing the room. I suspect that was the reason. Although there is an undeveloped argument we've seen in some law reviews that retaliatory viewpoint-based closure may give rise to a cause of action. Now, whether we get to that here, I don't know. That issue is not before us. It is not. I just noticed in the procedural history of the case that he had declined to say one way or the other whether the county could rescind the policy altogether. That is correct. Or close the room to whatever its use was limited to before the policy was promulgated. In the absence of some illicit motive which would complicate things, the county was never required to open it, and they could probably shut it tomorrow if they choose to. Or they could refine the policy to make it more restrictive if they could word it in such a way that it was content neutral. Given infinite possibilities, perhaps. Beyond that, I doubt it. We'll leave that one for the next appeal. Yes, sir. One last comment. I don't want to use up all my time. I was generous with the plaintiff's time. Thank you. One comment about her. There are a lot of interesting questions here. It's a fascinating case. It really is. One of the issues is trying to distinguish these school cases. If you look at them, every single one of the cases that counsel cites involved either, and usually a combination of all three or four, involuntary participation by a captive audience which is coerced under compulsory attendance requirements. And in the middle of that, you have state-sponsored expression. So that's a completely different category or kind of sphere of case versus your neutral, equal access kind of situation where you have private members of the public coming into a forum that's been opened for the purposes of expression where the only participants are the individuals who want to speak and listen to the speech themselves. I have two other questions for you, and then maybe we should hear from the Federal Government. I can't remember if I read this in Dr. Hopkins' declaration or if it was in the flyer, but I think he said something to the effect that Face Center wanted to use the facility so that he could bring the church to the people. Does that make a difference? Yeah. Does that suggest proselytizing, and does that make a difference? Dr. Hopkins is a female who sits here, and her ministry is to reach people who are threatened or intimidated or would not otherwise go into a bricks-and-mortar church. And her meetings are not only for those who are already converted, but those who may potentially be converted. So within that context, she can certainly proselytize or seek to convert nonbelievers into believers, as do as an evangelist. She does that. And, no, it does not make a difference, not in this case. Okay. I think that's it. Thank you, Your Honor. I'll turn the podium over to Mr. Conner from Mr. Dugan from the Department of Justice. May it please the Court, Conner Dugan for the United States. I think the United States' position can be summed up with this, that the county has to live with the terms of its policy. Judge Pais, I think you asked sort of the important question, and that is, can you understand this religious worship practice  to appeal to have a community interest? It can be. I think one of the problems the county has been operating under here is that it's been viewing this as an either-or situation. But I think what Good News Club and Widmar tell us is that you have to look beyond the label. It's not enough just to cabin it off into this idea of religious worship. And, in fact, to separate that out from the larger body of religious speech is not a distinction that the government or courts are really competent to make. But the idea that praise and worship segment of the larger meeting couldn't appeal to the larger community, I think, is something we try to challenge in our brief. We think that's an assumption that's sort of underlying their policy. So they have adopted this policy, and it's fairly broad. And so it's your position, or the government, is amicus of a friend of this Court. So you would say that this kind of activity, as described in the flyer, and what the faith-centered church wanted to do, is part of the community. Is that how you look at that? Yes. I think it has an appeal. It falls within those broad parameters. An anecdotal story here, I think, gets this. I'm riding yesterday with my cab driver past Grace Cathedral, and I asked him, is this the Grace Cathedral I see on the maps? He said, yes. And he said, I'm not a Christian, but I sometimes go to church. And I kind of asked, why is that? Do you have an interest? And he said, yes. This praise and worship segment of this larger Women of Excellence Conference, that's what it said on the flyer, can have an appeal to the community. Just because it's religious, we can't deem it as having no appeal to the larger community. I'd also like to address the point that was made about the federal funding and the fact that these faith-based initiatives have restrictions on the funds being used for proselytization and things like that. That's not an expressive form. The government has not opened up a form and asked different groups to come in and express their points of view. Rather, the government, in a sense, uses different secular and religious organizations to fund a social service that the government has chosen to take on. And so I think that that's a distinction that can easily be made between the federal funding. And also, it really is about the difference between sort of religious speech and non-religious speech, too. It's a broader thing than just religious services. I would also like to ---- But the government would agree with the characterization of a designated public forum. We didn't take a position in the brief, Your Honor, because we think this is viewpoint discrimination. It doesn't matter what kind of fora it is. Viewpoint ---- Well, it does matter, though, doesn't it? I thought the Supreme Court told us that depending on its designation, the degree of restriction might be looser or more severe. My understanding, with regard to the content restrictions, and that line between content and viewpoint, as the Court, I think, in Rosenberger said, is not always clear, viewpoint being a form of content restriction. But I think in Good News Club, the Court was quite clear. It said it does not matter what sort of forum this is. Viewpoint discrimination cannot be justified regardless of forum. And I think that that ---- Unless it's done on a content-neutral basis, then reasonable time, place, and manner restrictions can be imposed, right? And we conceded that in the brief, that time and manner place restrictions are perfectly legitimate here. And as Brother Counsel for Faith Center said, we would agree that those sorts of restrictions could be made and that you could put those restrictions on as long as they're applied neutrally. I think that ultimately this does seem to be a designated public forum, though. This has been open so broadly. And as we say in that second part of our argument, when you have such a broadly defined forum, you can't then decide just to keep out religious worship in the way they're doing. I mean, it's odd that this restriction only gets at one sort of viewpoint, and that is religious viewpoint. It's sort of like ---- There's another exclusion, though, right? The school can't use ---- can't turn it into a classroom and use it as a de facto school building. That's right. That is one of the restrictions. And I think opposing counsel also mentioned that some political restrictions, though I would point the Court to the supplemental excerpts of record, page 11, where the Democratic Club of East Contra Costa County said that they were going to hold a meeting to let people learn about Democratic candidates and issues. So it's unclear whether ---- where that line would be and whether or not they imposed it. But Justice Flanagan told me that the librarian would put a quick stop to that. Did put a quick stop to that. Would. Would put a ---- well, this was the application. And I think as far as I understand from the record, they were able to meet there. So I don't know if a stop was put to it. Let me ask ---- let me go back to my question that I was asking the counselor just a minute ago about, you know, just hypothetically speaking, on a Saturday afternoon, there was some need for some reason, god, who knows whatever, that local Methodist church or ---- It's Methodist now. Lutheran church or whatever you want to ---- Okay. Whatever. Take your religion. Wanted to use the library to hold a Lutheran or Methodist service. I think the answer is yes under the ---- Knowing exactly what it would entail, could the library say under this policy, could the library say no? Could the library say no? I don't believe so under this policy. I know. Because I think even the example you're giving has an appeal to the ---- has a community interest. It has educational elements. I mean, the Fifth Circuit or not the Fifth Circuit, the Eastern District of Louisiana in that St. Tammany case described it being nearly impossible to think of a religious service that would not have elements that would sort of appeal to sort of the moral life or try to educate the congregants there. So I think that's how that question has to be answered. Does the court have to decide that here? I'm not sure it does because I think if you follow the sort of the lead of Bronx Household of Faith, there it said we're not going to parse out the secular from the religious elements here. I mean, we're ---- But at the same time, both Good News Club and Bronx Household say that something that is quintessentially religious can also be ---- can meet ---- can be something from a particular viewpoint. And so that's ---- I think that's how I would answer your question, Your Honor. So on this flyer then, I gather, it says, Praise and Worship Special Speaker Dr. Hattie Hopkins, Sermon, Position Yourselves for Victory. So the library, I mean, they should take this as the sermon, as having ---- let's just say sermon for a moment. It doesn't say prayer or anything, but I assume there would be. But the sermon would have some educational value to anybody who might be interested in dropping by. Yes, I think she's going to be educating about how to position yourself for victory. I mean, that's certainly going to have religious content, but that would have an appeal to an array of people. I mean, it seems that the meeting that Faith Center had had an appeal. I think the facts show that 10 to 15, or at least the complaints said about 10 to 15 people showed up, just as the Sierra Clubs or the Narcoticus Anonymous Clubs have some sort of appeal to some segment of the community. So I think it's possible for them to draw up a regulation that would allow them to exclude this particular Praise and Worship, such as for my example of adopting a policy that says we're only going to allow groups who promote literacy programs or lectures or whatnot. I think it might be possible to ---- And they follow that consistently. To create what maybe we'll term a severely limited form. I mean, like you'll only talk about economics. And so if a political group comes in and tries to have a political rally at a meeting that's supposed to be about economics, I think that the county might be able to get at that. But that's not the question here. Right. That's not the ---- No, I understand. I understand where this all leads. Unless it dealt with an attack on the line item veto.  That's exactly right. Does the government have anything, any other points you wish to make? No. The only other point from Good News Club that I would point out, Your Honor, is that Justice Thomas, for the majority, said that we're not ---- that the Establishment Clause concern does not sort of devolve into a modified heckler's veto. We're going to worry about the misperception that maybe even the youngest person of the community would have. And I would just point, Your Honors, to that. Thank you. Thank you very much. I appreciate your argument. Let's see if we have some rebuttal time. I was a little surprised to hear Mr. Duggan say they think this is a designated forum because the government came pretty close to conceding this is a limited forum and it's brief at pages 10 and 11. How do we make that determination? Don't we look to the actual language of the county's policy? Well, no. The fact that we require an application and have a screening process itself, courts have said, constitutes a limited forum. All of the cases virtually that we've been discussing, Campbell v. St. Tammany, Good News Club, Bronx Household, all those forums were deemed to be limited forums. And I would posit that our forum certainly is no more open than any of those were. But I'm still trying to figure out what test does the court apply to reach that determination? What evidence do we look at? The fact that we have a screening process, the fact that we do reject applications, that itself goes into us not, it's not like a park or a town square where virtually anybody can just go stand on a soap box and say what they want to say. This meeting room has a policy. It has an application process. It has a screening process. And in all the cases of... But still, don't we still look at the policy, though? Isn't that also relevant? The words of the purpose of the policy, to permit the use of library meeting rooms for educational, cultural and community-related meetings, programs and activities? Well, it would be relevant, but the process itself is relevant, too. And there's various cases. The ones I've discussed, there's a whole bunch of cases cited by the United States in its brief, all of which come to the conclusion that similar meeting rooms are a limited forum, which means we can... That is, do we still then test the constitutionality of the policy by asking whether or not it constitutes viewpoint discrimination, so it doesn't really matter how we designate the forum? Well, if the county is found, if the county's policy is deemed to be viewpoint discrimination, it doesn't matter what the forum is. The test would be the same. It would be a strict scrutiny, compelling interest kind of test. But if the county's policy is deemed to be content, delineate based on content, that a religious service is something different in kind, just like a political campaign activity is different in kind than a political discussion, then our policy need only be reasonable. And I think our Establishment Clause concerns certainly would constitute a reasonable issue, a reasonable basis to exclude the category of religious services. And back to the example of the literacy example, Mr. Bull conceded virtually that a religious service is something different, because in that literacy example he said we'd have to allow a church in to discuss literacy or the Bible or books or literature from a religious perspective. But under that policy, we would not have to allow a religious service in. That's an acknowledgment that a religious service is something different. That's not, but, okay, let's just take that to what the government was saying in response to one of my questions. First of all, we don't have that policy, but why isn't worship and religious service part of the community or educational service or educational benefits or the civic? Why isn't that part of that? Well, I'm trying to see the problem here might be, might be, and I don't know yet. I haven't come to any conclusions about this case, and I have some other questions I want to ask in just a moment. But why is the problem here the way in which the policy was defined? I don't think so. I think it's I don't think the test is does a religious service appeal to the community. I mean, lots of churches are crowded places. Clearly, there's interest in religious services. The question is, is it appropriate to have a religious service in a public open library as an alternative to those church buildings? Should a government building be an alternative to a church sanctuary? Should a government space be used to, in this case, spread the gospel of Jesus Christ? But the Supreme Court has said you can use school buildings after normal school hours for those purposes. That's okay. Never. They haven't addressed the issue of just or of a distinct worship service. Good news carves out whatever mere religious worship is. And if it's not, if mere religious worship isn't a religious service that a sect or a religion would ordinarily have in their sanctuary if the people would go to a traditional church building, then I don't know that mere religious worship has a meaning. And presumably it does, or the Supreme Court wouldn't have carved it out. What if somebody wanted to use the meeting room to hold a memorial service for the dearly beloved mayor of Antioch who was suddenly killed? And as part of that memorial service, there was prayer and a homily given by a local minister. If it was a religious memorial service, it would be precluded under the policy. When does having people step up to the podium and talk about wonderful reminiscences of the dearly departed turn into a religious service? If it follows some sort of even loose structure as a religious service. So massive Christian burial would be prohibited, but it might be okay if we offered a prayer at the beginning and a prayer at the end? Interspersed with reminiscences from friends and family members in between? If the friends and family members wanted to come together and have reminiscences, and at some point someone decides to offer a prayer, that is not necessarily a religious service. Just like if someone is having a meeting about any subject and someone decides to offer a prayer for something in the middle of it, I don't know that that becomes a religious service. But a religious service, and the way the church here frames this in the complaint is, we want to do something in your public government building that ordinarily people do in a church, but because people don't want to walk into a church, we want to use your library meeting room. And it's different than holding a religious service, practicing one's religion effectively, it's different than discussing it or discussing other issues from your religious perspective. It's different in kind from a discussion from a particular viewpoint. I think the example I used in the district court was my daughter's middle school, open house. And they did the rise of Islam from a historical perspective, and there were maps all over the place and they were talking about Islam. Not a problem. But if the same teacher had had those children bow towards Mecca and pray, presumably there would have been an uproar that they were practicing a religion in the public school. And it seems to me a relatively easy distinction to make. And I don't know that it's a lot harder to make here. Once you cross over into the practicing of one's religion through a religious worship service, that is something that our policy excludes. And it's just a ‑‑ I must admit I'm not familiar with the new age religions, but, you know, what about a new age religion service? Well, I'm not real familiar with that either. I don't know. There's all kinds of religious services. It would be how the group defines that. I mean, presumably if they have some sort of service, it has some sort of form, they know what it is. Some are more structured than others, but certainly the group doing it knows what it is. But it's not ‑‑ you know, you keep coming back to this theme that it's the group that somehow regulates itself. It looks at the county policy, and then it says, oh, I can't do that because this is a religious service, and I know it's a religious service, therefore I can't use the room. But the FACE Center filled out the application and said, we want the room. And when the county said, here's what the policy is, they said, we want the room. And now the problem is a government official has to decide whether the content of the activity is a religious service or not. And I don't see how that isn't viewpoint discrimination. Well, in this case, I think there may have been some confusion at the time the application was pointed out that the policy has evolved and did use to preclude religious purposes or activities or services, I think. And so I'm not sure that the fact that when FACE Center filled it out, what their understanding of the policy was, and it may well have been under the previous policy. But you agree, don't you, that at some point some official from Contra Costa County, whether it's the librarian or the chairman of the Board of Supervisors, has to make a decision as to whether or not the activity violates the policy? There might be if it was somehow unclear. If someone read the policy, saw no religious services, and still filled out an application in a manner that it was not clear what they were going to be doing, there might have to be inquiry. But again, we have to be able to rely on people to accurately to know what the policy is and to accurately fill out the application. We've been very generous, but I just have one last area of inquiry for you. And it has to do with the procedural posture of this case, which is it comes to us on a grant of a preliminary injunction. You're up here on our standard of review for the bottom line is abusive discretion. Of course, if the district court judge misapplied the law, that could constitute an abusive discretion. Well, it looks like, when you read the transcript, it looks like the judge here, Judge White, looked at all the cases, considered all the arguments, the available documents that were presented, had a thorough debate with the parties, and then exercised his discretion in granting the preliminary injunction. Now, can we really say that he misapplied, that he got the law all wrong? Well, but I think as to that analysis, as to the law, I think it's a de novo review. And especially with the Constitution. On the legal question. Right. On the legal questions, I think it's a de novo review, and especially since we're dealing here with constitutional issues. And I think with that de novo review of the legal standards, it might well be that there was an abusive discretion. And my last question for you, and I don't know if Mr. Tolman has any further. What – which Supreme Court cases did he misapply? Supreme Court cases? Well, pardon me? Ninth Circuit cases. Well, primarily good news, which good news is different because they weren't doing a religious worship service. And to the extent that I think Mr. Bowles said that we're trying to resurrect Judge Souter's argument that somehow it's a different So, you know, I would agree. We don't look at the label. We look at what they're doing. And good news, they said it wasn't – and good news, they said it wasn't worship. And after that, the lower court didn't apply Ninth Circuit precedent, but instead looked to Bronx Household and Campbell v. St. Tammany, which is an Eastern District of Louisiana case, which in both cases, the court sort of said, well, we're not sure after good news whether mere religious worship is prohibited or not. And it doesn't matter because the group here is doing more than just mere religious worship and we're not going to separate it out. In the Ninth Circuit, there's been a willingness to separate it out in a different form, admittedly, in the school graduation cases and the student pamphlet. But I don't think the form is the important part of those cases. The important thing is there's been a willingness to say you can divide permissible religious sort of perspective on a secular topic from pure religious proselytizing or other kinds of religious speech. And I don't think the lower court took that into consideration. Anything else? Thank you all. Thank you very much. We appreciate the arguments. It's very interesting, very helpful. Thank you. The matter will be submitted.
judges: Paez, Tallman, Karlton